IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JUDGE TORRES

ARLES CEPEDA,

                  PLAINTIFF,

    vs

THE CITY OF NEW YORK, a municipal entity,
NEW YORK CITY POLICE DETECTIVE THEODORE
STEFATOS, NEW YORK CITY POLICE OFFICERS
"JOHN DOES" 1-4,

           DEFENDANTS.

**15 CV 00510**

INDEX NO.

ECF CASE

COMPLAINT

[JURY TRIAL DEMANDED]



RECEIVED
JAN 23 2015
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff ARLES CEPEDA, by her attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully alleges as follows:

## I. PRELIMINARY STATEMENT

1.      Plaintiff ARLES CEPEDA bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of her civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

## II. JURISDICTION

2.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

3.      Plaintiff ARLES CEPEDA further invokes this Court's supplemental jurisdiction, pursuant to 28 USC § 1367, over any and all State law claims and causes of action which derive

from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

### III. VENUE

4.       Venue is proper for the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the claims arose in this district.

### IV. JURY DEMAND

5.       Per F.R.C.P. 38(b), Plaintiff demands a trial by jury of all issues in this matter.

### V. THE PARTIES

6.       The Plaintiff ARLES CEPEDA is a resident of the City of New York, State of New York, and the County of Bronx.

7.       Defendant THE CITY OF NEW YORK was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

8.       Defendant THE CITY OF NEW YORK maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

9.       That at all times hereinafter mentioned, the Defendant NEW YORK CITY POLICE DETECTIVE THEODORE STEFATOS and NEW YORK CITY POLICE OFFICERS "JOHN DOES" 1-4 (Collectively, "Defendant Police Officers," individually, "Defendant Police Officer") were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

2

10.      Each and all of the acts of the Defendant Police Officers alleged herein were done by said Defendants while acting within the scope of their employment by Defendant THE CITY OF NEW YORK, in furtherance of their employment by Defendant THE CITY OF NEW YORK.

### VI. FACTS COMMON TO ALL CLAIMS

11.      At all times relevant herein, Plaintiff ARLES CEPEDA was and is an elderly Hispanic female resident of the Castle Hill Housing Project ("Castle Hill Houses") in the Bronx.

12.      The Castle Hill Houses are crime-ridden[1] and in need of millions of dollars of maintenance[2].

13.      Plaintiff ARLES CEPEDA lives alone in an apartment in desperate need of maintenance.

14.      Plaintiff ARLES CEPEDA lives in proximity to a number of apparent drug dealers, and often sees suspicious and dangerous persons in the hallway outside of her apartment.

15.      As directed by NYCHA, Plaintiff ARLES CEPEDA reports maintenance issues and conditions requiring attention to 311.

16.      Throughout 2012, Plaintiff ARLES CEPEDA was forced to call 311 on a number of occasions to report maintenance problems and conditions requiring attention.

17.      In early December of 2012, Plaintiff ARLES CEPEDA called 311 to complain about the drug dealers on her floor, and gang activity in her building.

---

[1] Ryley, Parascandola, Paddock and Smith, "NYCHA Units See Spike In Crime That Outpaces City, Leaving Residents In Fear," New York Daily News, April 6, 2014, available online at http://www.nydailynews.com/new-york/nyc-crime/nycha-residents-live-fear-major-crimes-public-housing-soar-article-1.1747195
[2] Mireya Navarro, "Public Housing In New York Reaches A Fiscal Crisis," New York Times, August 11, 2014, available online at http://www.nytimes.com/2014/08/12/nyregion/new-york-public-housing-faces-crisis-as-demands-and-deficits-grow.html?_r=0

**18.**     On information and belief, it was entirely appropriate for Plaintiff ARLES CEPEDA to register these complaints with 311.

**19.**     On the morning of December 4, 2012, Plaintiff ARLES CEPEDA received a call from a Defendant Police Officer requesting to speak with her about her complaints.

**20.**     Plaintiff ARLES CEPEDA agreed, and Defendant POLICE DETECTIVE THEODORE STEFATOS and two other Defendant Police Officers soon came to her apartment.

**21.**     Instead of addressing her complaints, one of the Defendant Police Officers asked Plaintiff ARLES CEPEDA why she had been calling 311 so much.

**22.**     Plaintiff ARLES CEPEDA replied, in sum and substance, that she did not know who else to call to address the problems she was having with her dangerous neighbors and crumbling home.

**23.**     One or more of the Defendant Police Officers then stated to Plaintiff ARLES CEPEDA, in sum and substance, that she should not be calling 311, and that she was no longer allowed to call 311, and that she would be arrested and taken to the precinct for calling 311 too much.

**24.**     The Defendant Police Officers then proceeded to handcuff Plaintiff ARLES CEPEDA and transport her to the NYPD 43rd Precinct.

**25.**     Plaintiff ARLES CEPEDA was photographed, fingerprinted, and forced to wait in a cell for several hours.

**26.**     At approximately 2:30 in the afternoon, after she had been in custody for approximately four (4) hours, Plaintiff ARLES CEPEDA was released with a Desk Appearance Ticket executed by Defendant POLICE DETECTIVE THEODORE STEFATOS, charging

Plaintiff ARLES CEPEDA with a single count of PL §175.30, offering a false instrument for filing in the second degree, a Class A Misdemeanor punishable by up to one year in jail.

27. PL §175.30, *inter alia*, forbids knowingly offering a written instrument containing false statements to a public office or public servant with the intent for it to be filed or otherwise acted upon.

28. Plaintiff ARLES CEPEDA had offered no written instruments to any public office or public servant.

29. Plaintiff ARLES CEPEDA had offered no false information of any sort to any public office or public servant.

30. Defendants had no cause, reasonable or otherwise, to charge Plaintiff ARLES CEPEDA under PL §175.30.

31. Defendants charged Plaintiff ARLES CEPEDA under PL §175.30 to punish her for following appropriate municipal protocol for reporting maintenance issues and conditions requiring attention to Defendant CITY OF NEW YORK.

32. Plaintiff ARLES CEPEDA went to court on the date specified on her Desk Appearance Ticket.

33. At the Court, Plaintiff ARLES CEPEDA was informed that the charges against her were never filed, and that she had no charges pending.

34. On information and belief, the Defendant Police Officers arrested the Plaintiff, at least in part, to meet some or all of their prescribed quantitative productivity goals for arrests.

35. As a result of the foregoing, Plaintiff ARLES CEPEDA sustained, *inter alia,* mental injuries, emotional distress, embarrassment, humiliation and deprivation of her constitutional rights.

5

**36.**     Plaintiff ARLES CEPEDA continues to live in difficult and dangerous conditions in the Castle Hill Houses, and fears that she will be arrested again if she seeks assistance from Defendant CITY OF NEW YORK.

**FIRST CLAIM FOR RELIEF**
**DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

**37.**     Plaintiff ARLES CEPEDA incorporates the allegations above by reference.

**38.**     All of the aforementioned acts deprived Plaintiff ARLES CEPEDA of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

**39.**     The Defendant Police Officers and Defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

**40.**     As a result of the foregoing, Plaintiff's liberty was restricted for an extended period of time, she was put in fear for her safety and she was humiliated, without probable cause.

**41.**     As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to her reputations and standing within her community.

**42.**     As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

**SECOND CLAIM FOR RELIEF- FALSE ARREST UNDER 42 U.S.C. § 1983**

**43.**     Plaintiff ARLES CEPEDA incorporates the allegations above by reference.

6

**44.**      Plaintiff ARLES CEPEDA was taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

**45.**      As a result of the foregoing, Plaintiff ARLES CEPEDA's liberties were restricted for an extended period of time.

**46.**      As a result of the foregoing, Plaintiff ARLES CEPEDA was put in fear for her own safety and humiliated without probable cause.

**47.**      As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF-  RETALIATION FOR
## FIRST AMENDMENT PROTECTED EXPRESSION UNDER 42 U.S.C. § 1983

**48.**      Plaintiff ARLES CEPEDA incorporates the allegations above by reference.

**49.**      Plaintiff ARLES CEPEDA came into contact with the Defendant Police Officers because Plaintiff had engaged in protected speech or conduct, i.e., reporting a condition in need of intervention to agents of the municipality.

**50.**      Defendant Police Officers took adverse action against Plaintiff ARLES CEPEDA.

**51.**      Upon information and belief, there was a causal connection between the protected speech and conduct engaged in by Plaintiff ARLES CEPEDA and the adverse actions taken by the Defendant Police Officers.

**52.**      Defendants deprived the Plaintiff of her liberty both in violation of her civil and constitutional rights, as guaranteed under 42 U.S.C. §1983 and set forth in the United States Constitution, First, Fourth and Fourteenth Amendments and the Constitution of the State of New York and in direct retaliation for the Plaintiffs' exercise of their civil and constitutional rights of free speech, free expression and expressive association as guaranteed by First and Fourteenth

Amendments to the United States Constitution as well as the Constitution of the State of New York.

53.    As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to her reputation and standing within her community.

54.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

**FOURTH CLAIM FOR RELIEF- MUNICIPAL LIABILITY UNDER *MONELL***

55.    Plaintiff ARLES CEPEDA incorporates the allegations above by reference.

56.    The following practices or customs of the New York City Police Department contributed to or caused the violations of Plaintiff ARLES CEPEDA's civil rights by Defendants:

    a.    the continuing practice or custom of New York City Police Officers wrongfully arresting individuals without conducting investigations sufficient to ascertain whether there is probable cause to arrest said persons;

    b.    the continuing practice or custom of New York City Police Officers wrongfully arresting minority individuals without conducting investigations sufficient to ascertain whether there is probable cause to arrest said persons;

    c.    the continuing practice of failing to properly screen, supervise, discipline, transfer, counsel, or otherwise control police officers engaged in the excessive use of force or in warrantless or otherwise unconstitutional arrests or

otherwise impermissible violations of individuals' constitutional rights, particularly with respect to officers who are repeatedly accused of such acts;

d. the custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence," wherein members of the New York City Police Department intentionally and willfully fail to cooperate with investigations into the misconduct or corrupt activities of their fellow officers, a practice which leads New York City Police Officers to regularly condone and cover up police abuse of power by telling false and incomplete stories; and

e. the continuing practice or custom of New York City Police Officers utilizing their powers of arrest and detention in a punitive, retaliatory or otherwise wrongful manner in interactions with minorities, as shown in *Floyd et al. v. City of New York et al.*, SDNY No. 08 Civ. 1034(SAS), among other cases.

f. the continuing practice of failing to properly screen, supervise, discipline, transfer, counsel, or otherwise control police officers engaged in the excessive use of force or in warrantless or otherwise unconstitutional arrests or otherwise impermissible violations of individuals' constitutional rights, particularly with respect to officers who are repeatedly accused of such acts, as shown in *Floyd et al. v. City of New York et al.*, SDNY No. 08 Civ. 1034(SAS), among other cases.

**DESPITE DUE AND REPEATED NOTICE OVER MANY YEARS, DEFENDANT CITY OF NEW YORK HAS FAILED TO TAKE ANY STEPS TO CURB "CONTEMPT OF COP" ARRESTS, RESULTING IN INJURY TO THE PLAINTIFF, WHILE OTHER MUNICIPALITIES HAVE ADDRESSED AND CORRECTED SIMILAR ISSUES**

**57.**   On information and belief, Defendant CITY OF NEW YORK has had notice of, and tacitly condoned, its police officers' proffering of pretextual and false charges for personal vindication and/or to putatively justify improper uses of force against civilians.

**58.**   In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

**59.**   On February 28, 2008, the Seattle Post-Intelligencer published an investigative review of six (6) years of Seattle Municipal Court files, wherein the Post-Intelligencer's investigators found that African-Americans in that predominantly Caucasian city were arrested solely on charges of "obstructing a public officer" and related crimes such as resisting arrest eight times as often as Caucasians.[3]

**60.**   The Seattle Post-Intelligencer's investigative review cited above also found that the Seattle City Attorney's Office dropped nearly half of all Seattle criminal cases predicated solely on charges of "obstructing a public officer" and related crimes such as resisting arrest between January 2002 and 2008. *See* fn3.

**61.**   In response to Seattle Police officers' questionable arrest activities discussed above, "Leo Poort, the [Seattle Police] department's legal adviser, included warnings

---

[3] Nalder, Kamb and Lathrop, "*Blacks Are Arrested on 'Contempt of Cop' Charge at Higher Rate,*" Seattle Post-Intelligencer, February 28, 2008. Article incorporated herein by reference.

about obstruction arrests in... his top twelve (12) tips to officers for 'avoiding civil liability lawsuits.' 'Don't arrest for 'contempt' of cop,' he wrote in tip No. 3. 'Officers must be thick skinned and not unduly influenced by the attitudes of persons they contact. Flunking the 'attitude' test (is) not a bookable offense.'" *See* fn3.

**62.** In a review of San Jose criminal cases published on October 31, 2009, the San Jose Mercury News reported that the Santa Clara County Prosecutor declined to prosecute over one-third (33.33...%) of resisting arrest cases brought by San Jose police, a rate that is markedly disproportionate to the Santa Clara County Prosecutor's general twenty percent (20%) decline-to-prosecute rate.[4]

**63.** The San Jose Mercury News investigation cited above also found that the San Jose Police Department did not sustain or substantiate civilian complaints with respect to any of the ninety-nine (99) use-of-force cases that it reviewed in 2008, even though the San Jose Independent Police Auditor disagreed with police findings in twenty-five (25) of those 99 cases. *See* fn4.

**64.** In response to the San Jose Mercury News investigation cited above, the San Jose Police Department instituted a new policy of tracking arrests where it appears that resisting arrest is being used as a cover charge to justify unnecessary and excessive police uses of force on civilians. *See* fn4.

**65.** A November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that

---

[4] Webby, Sean, "Mercury News investigation: San Jose police often use force in resisting-arrest cases," San Jose Mercury News, October 31, 2009. Article incorporated by reference herein and available online at http://www.mercurynews.com/top-stories/ci_13686438?nclick_check=1

at that time, Defendant City of New York did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest.[5]

66.   November 19, 1997 New York Times special report on police brutality predicated on perceived or actual disrespect of New York City Police Officers noted that at that time, Defendant City of New York did not monitor or track police use or levying of charges such as disorderly conduct or resisting arrest, despite considerable anecdotal evidence that New York City Police Officers were arresting individuals on those and other like charges to justify use of force and/or to punish those individuals for "contempt of cop." *See* fn5.

67.   The above-cited New York Times special report noted that Los Angeles had already instituted a system for tracking the initiation and dispositions of "contempt of cop" and "cover charge" charges such as resisting arrest and disorderly conduct as of the time of that article's publication in 1997. *See* fn5.

68.   Upon information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing decades-old custom or practice of charging individuals with crimes and violations such as resisting arrest, disorderly conduct, and obstruction of governmental administration for personal vindication and/or as pretexts to justify use of force, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the

---

[5] Sontag, Deborah, and Barry, Dan, "CHALLENGE TO AUTHORITY: A special report.; Disrespect as Catalyst for Brutality," New York Times, November 19, 1997.  Article incorporated by reference herein and available online at http://query.nytimes.com/gst/fullpage.html?res=9807E7D9163BF93AA25752C1A96195 8260&scp=8&sq=contempt+of+cop&st=cse&pagewanted=all.

improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" practices and customs.

**69.** Upon information and belief, and despite due and repeated notice that New York City POLICE OFFICERS have an ongoing custom or practice of charging individuals with crimes and violations for personal vindication and/or as pretexts to justify use of force, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" practices and customs.

**70.** Upon information and belief, and despite due and repeated notice that New York City POLICE OFFICERS have an ongoing custom or practice of charging individuals with crimes and violations, as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date, Defendant City of New York has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City POLICE OFFICERS of so-called "contempt of cop" and "cover charge" practices and customs.

**THE PRACTICES AND CUSTOMS OF THE NEW YORK CITY POLICE DEPARTMENT ENABLE ITS OFFICERS TO ENGAGE IN RETALIATORY AND OTHER MISCONDUCT WITHOUT MEANINGFUL OVERSIGHT, RESULTING IN INJURY TO THE PLAINTIFF**

**71.** On information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of their official powers and of force against persons and persons' property.

72.   In doing so, Defendant CITY OF NEW YORK has failed to act to remedy this ongoing practice where other municipalities, faced with notice of similar issues, have taken meaningful affirmative steps to curb said tendencies among their own police officers.

73.   On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen Commission Report," "The Report").[6]

74.   The Mollen Commission Report was subtitled "ANATOMY OF FAILURE: A PATH FOR SUCCESS."  The Report at page before "i."

75.   The July 7, 1994 Mollen Commission Report was prepared for and at the request of the Defendant City of New York, and therefore knowledge of its contents may be imputed to Defendant City of New York.

76.   The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence."

77.   The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994 Mollen Commission Report.

_____

[6] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York.  Incorporated by reference herein and available online at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

**78.**   One police officer who testified before the Mollen Commission explained that the code of silence "…starts in the Police Academy, and it just develops from there.… It starts with the instructors telling you never to be a rat, never give up your fellow officer. It starts with other recruits telling you they'll never give you up, and it just goes down the line as you go… into a precinct." The Report at 55.

**79.**   Another officer who testified before the Mollen Commission stated that "[c]ops don't tell on cops. And if they did tell on them, just say if a cop decided to tell on me, his career's ruined. He's going to be labeled as a rat.… he's going to have nobody to work with. And chances are if it comes down to it… [the whistleblower's fellow officers are] going to let him get hurt." The Report at 53-54.

**80.**   A third officer who testified before the Mollen Commission concurred, stating: "[i]f you're labeled a rat… you're going to have a difficult time for the remainder of your career.… [i]t was something that you couldn't shake." Id. at 54.

**81.**   An NYPD lieutenant who testified before the Mollen Commission confirmed that officers are at times "ostracized" for breaking the code of silence. Id.

**82.**   An NYPD captain who disciplined his subordinates for misconduct and reported allegations of corruption to NYPD Internal Affairs explained to the Mollen Commission that he had been transferred to thirty-eight (38) different commands in the course of his career, and in almost every case "he found evidence that his reputation had preceded him. At one command, his locker was burned; at another, his car tires were slashed; at another, he received threats of physical harm." Id.

**83.**   The *Mollen Commission Report* explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical

issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

**84.** The *Mollen Commission* went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

**85.** The *Mollen Commission* found that "[police b]rutality is... used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

**86.** One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance. It's not simply giving a beating. It's the other officers begin [sic] to accept you more." Id.

**87.** The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence.... [b]ecause a complaint usually comes down to an officer's word (and often the word of fellow officer witnesses) against the... [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse." The Report at 49.

**88.** As of the July 7, 1994 *Mollen Commission Report*, Defendant City of New York had notice that the officers and commanders of the New York City Police Department tolerated and encouraged police to lie to cover up the wrongful conduct of themselves and their fellow officers, including inappropriate conduct like that which was perpetrated by Defendant Police Officers upon Plaintiff ARLES CEPEDA.

**89.** On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

**90.** On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

**91.** The failure of Defendant CITY OF NEW YORK to meaningfully address these issues was underscored when the non-governmental organization Human Rights Watch conducted a study examining common obstacles to accountability for police abuse in fourteen large cities, including Atlanta, Boston, Chicago, Detroit, Indianapolis, Los Angeles, Minneapolis, New Orleans, New York, Philadelphia, Portland, Providence, San Francisco, and Washington, D.C.[7]

**92.** Research for this report was conducted over two and a half years, from late 1995 through early 1998. *See* fn7.

**93.** The report stated: "The barriers to accountability are remarkably similar from city to city. Shortcomings in recruitment, training, and management are common to all. So is the fact that officers who repeatedly commit human rights violations tend to be a small minority who taint entire police departments but are protected, routinely, by the silence of their fellow officers and by flawed systems of reporting, oversight, and accountability. Another pervasive shortcoming is the scarcity of meaningful information about trends in abuse; data are also lacking regarding the police departments' response to those incidents and their plans or actions to prevent brutality. Where data do exist, there is no evidence

---

[7] "Shielded from Justice: Police Brutality and Accountability in the United States," Human Rights Watch, June 1998.  Report incorporated by reference herein and available online at http://www.columbia.edu/itc/journalism/cases/katrina/Human%20Rights%20Watch/uspo html/toc.htm.

that police administrators or, where relevant, prosecutors, utilize available information in a way to deter abuse." *See* Id.

**94.** The report documented that the official response of the New York City Police Department and the City of New York, to credible, persistent reports of abuse was to deny the existence of the problem. *See* Id.

**95.** The report documented that the New York City Police Department, and the City of New York failed to discipline officers in all but 1% of incidents in which complaints were filed with the Civilian Complaint Review Board. *See* Id.

**96.** Upon information and belief, the report was presented to Mayor Rudy Giuliani of the City of New York.

**97.** Upon information and belief, the Mayor denounced the report without reading it.

**98.** Upon information and belief, Kenneth Roth, then Executive Director Human Rights Watch wrote in an open letter to the Mayor on July 14, 1998: "Rather than engage in a serious discussion of the problem of police brutality in New York City, you attacked those who raised the issue -- apparently without even reading the advance copy of the report we had sent you."

**99.** Upon information and belief, Defendant CITY OF NEW YORK has been, and continues to be, aware of the prevalence of the problem of officers of the New York City Police Department engaging in excessive force, but has failed to take action to remedy the problem.

**100.** That the Defendant City of New York continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their

fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

a. *Ariza v. City of New York*, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers.... [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

b. *White-Ruiz v. City of New York*, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996) ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]

c. *United States v. Rosario*, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]

d. *Barry v. New York City Police Dep't*, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence.... Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."

e. *Griffin v. City of New York et al.*, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff

detective sues on pattern of retaliation following his reporting fellow detective

to Internal Affairs, fellow officers cover for detective accused of misconduct,

see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective]

Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the

material witnesses failed to cooperate with the investigation by being less than

truthful.... [a]s a result, the allegations made by Plaintiff against McCarthy were

dismissed as unsubstantiated."]

**101.** Upon information and belief, the above-referred constitutionally violative

policies, practices and customs remain widespread, open, and notorious throughout the

NYPD to date.

**102.** Upon information and belief, the policymakers of the NYPD and Defendant City

of New York are aware that these practices and customs of NYPD officers continue to

date, and have failed to take adequate steps to curb these practices and customs, which

regularly cause the violation of citizens Constitutional rights.

**103.** Defendant City of New York has failed to meaningfully curb these

Constitutionally-violative customs and practices to date.

**104.** In the introduction to the Mollen Commission Report, it is noted that "the

[Internal Affairs] system designed to protect the [New York City Police] Department

from corruption minimized the likelihood of uncovering it." The Report at 3.

**105.** The Mollen Commission Report explained that at that time, the Internal Affairs

Division (re-named the Internal Affairs Bureau in a 1993 restructuring) attempted "to

close cases with as little effort as possible.... One officer told us they sit around and 'eat

donuts and do crossword puzzles' -- and the supervisors and commanders did little more.... an anonymous survey of the work conditions and attitudes of IAD investigators... revealed that almost half of IAD investigators' time was spent on non-investigatory matters -- and more of their 'investigative' work was done without ever leaving their office.... The facts confirmed IAD's do-nothing reputation." The Report at 85.

**106.** Since the Mollen Commission Report was published in 1994, the number of complaints of police corruption and other misconduct logged annually by NYPD Internal Affairs has nearly quadrupled, rising from 14,789 logs received in 1994 to 44,994 logs received in 2006, the last year for which NYPD reporting is available. *NYPD Internal Affairs 2006 Annual Report*, 12-13.[8]

**107.** Over that same time period, the number of corruption and other police misconduct complaints investigated annually by NYPD Internal Affairs has fallen by more than half, from 2,258 investigations in 1994 to 1057 investigations in 2006. *Id.*

**108.** More up-to-date information relating to these customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department is available in "THE PRICE OF BRUTALITY: A special report.; Police Complaints Settled, Rarely Resolved." *The New York Times*, September 17, 1997.[9]

---

[8] 1993-2006 Internal Affairs Reports available online at http://www.nyclu.org/news/nyclu-releases-16-years-of-nypd-corruption-reports.

[9] Sontag, Deborah & Barry, Dan, *The New York Times*, Sept. 17, 1997 available online at http://www.nytimes.com/1997/09/17/.../price-brutality-special-report-police-complaints-settled-rarely-resolved.hmtl.

**109.** Upon information and belief, the steady decline in investigations by NYPD Internal Affairs since the publication of the Mollen Commission Report is representative of a return to a "business-as-usual" mentality with respect to police corruption and brutality within the NYPD.

**110.** Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively fulfilling its mandate of policing NYPD corruption and brutality generally.

**111.** Upon information and belief, Defendant City of New York has had notice through the annual NYPD Internal Affairs reports that NYPD Internal Affairs is not effectively curbing the established and widespread customs and practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

**112.** Defendant City of New York has also had notice that the New York City Civilian Complaint Review Board ("CCRB") has not been effective in curbing the above-referred practices of NYPD officers employing brutality with impunity and covering for one another's misconduct.

**113.** This is not a new phenomenon; in *Sango v. New York*, 1989 U.S. Dist. LEXIS 18214, 40-41 (S.D.N.Y. June 19, 1989), the court found that CCRB investigations into police misconduct were so grossly inadequate that "their predictable results could have led... officers to believe that their conduct, no matter how improper, would go unpunished."

**114.** That Defendant City of New York had knowledge of its continuing failure to abate the above-referred practices and customs can be shown with reference to the following facts reported to the City in the *2006 Annual Report* of the CCRB:[10]

    a. Only 12,059 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 received full investigations. *CCRB 2006 Annual Report*, 93.

    b. Only 1,441 of the 29,446 cases of alleged police misconduct closed by the CCRB between 2002 and 2006 resulted in a finding of even one substantiated allegation. *Id.*

    c. The NYPD either took no disciplinary action whatsoever or merely issued instructions in 1,062 of the 1,918 cases of CCRB-substantiated police misconduct closed by the department between 2002 and 2006. Some of these cases had been forwarded to the NYPD by the CCRB before 2002. *Id.* at 101.

    d. In the five years between 2002 and 2006 only one (1) NYPD officer was subject to employment termination as a result of allegations of misconduct substantiated by the CCRB. *Id.* at 100.

    e. The CCRB substantiated only 3.5% of the excessive force allegations reported between 2002 and 2006. *Id.* at 95.

**115.** The New York Civil Liberties Union report on the CCRB's activities between 1994 and 2006, entitled "Mission Failure: Civilian Review of Policing in New York City 1994-2006" ("NYCLU Report")[11] reviewed, collated and summarized information from the CCRB's Annual Reports and other sources, resulting in the following findings:

    a. CCRB complaint data indicates that serious police misconduct, including improper threats and use of force, occurs with significant frequency, with allegations of excessive force in half of all complaints filed with the CCRB. NYCLU Report at 4.

---

[10] 2001-2010 CCRB Reports available online at
http://www.nyc.gov/html/ccrb/html/reports.html.

[11] Available online at http://www.nyclu.org/files/ccrb_failing_report_090507.pdf.

b. The NYPD takes no disciplinary action whatsoever against nearly 30% of officers named in substantiated CCRB complaints, and gave only "instructions" to nearly a third of officers who were disciplined following substantiated CCRB complaints between 2000 and 2005. Id. at 5.

c. "In recent years it appears that the NYPD has adopted a radically more lenient disciplinary standard as regards acts of police misconduct directed at civilians. In 2004 the police department ordered instructions in approximately 30 percent of all disciplinary actions related to a substantiated CCRB complaint. In 2005 instructions represented nearly 60 percent of such disciplinary actions; and in 2006 instructions rose to 72 percent of all disciplinary actions related to police misconduct directed at civilians. Suspension of a police officer has become an extraordinarily rare occurrence, even when egregious acts of misconduct are involved." Id. at 6.

116. In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

117. In all, the cases, studies, and reports cited in the paragraphs above demonstrate that the Defendant City of New York knew or should have known that the customs and practices of NYPD officers covering for and otherwise condoning or abetting the unlawful, wrongful and/or unconstitutional actions of their fellow police officers continued after the Mollen Commission Report to the present day.

118. The policy of failure to screen, discipline, supervise, counsel, transfer, control, and correct unconstitutional patterns or conditions, is evidenced, *inter alia*, by the cases and reports cited above.

119. Upon information and belief, Defendant, CITY OF NEW YORK, and the New York City Police Department failed to effectively screen, train, supervise and discipline its police officers, including, but not limited to, Defendant Police Officers, as

demonstrated by their propensity for retaliatory conduct towards civilians, and for their failure to protect citizens from unconstitutional conduct of other police officers.

120. Upon information and belief, Defendant CITY OF NEW YORK has failed to put into place and otherwise maintained an inadequate structure for risk containment and stress management relative to its police officers. *Inter alia*, the structure was deficient at the time of pre-selection and selection to evaluation and exchange within the command structure about the performance of individual police officers; to the training of supervisory personnel to effectively and adequately evaluate performance of an officer; and to otherwise put the command structure on notice that an individual was at significant levels of risk to the public at large or to specific segments thereof.

121. The net effect of these deficiencies and failures was to permit police officers of the New York City Police Department to function at levels of significant and substantial risk to the public.

122. Upon information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality, choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

123. Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

**124.** Upon information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the practice and custom of the use of excessive force and police brutality by the police officers of the New York City Police Department to continue.

## UNCONSTITUTIONAL ARREST QUOTAS ILLEGALLY IMPLEMENTED BY THE NEW YORK CITY POLICE DEPARTMENT CONTRIBUTED TO THE INJURY SUFFERED BY THE PLAINTIFF

**125.** Upon information and belief, police officers in the New York City Police Department, including the Defendant "John Doe" POLICE OFFICERS, are trained, ordered or encouraged to meet quantitative enforcement "productivity goals" promulgated by policymakers and/or supervisory staff of Defendant CITY OF NEW YORK's police department.

**126.** Said quantitative enforcement "productivity goals" can also be referred to as arrest quotas.

**127.** The need to meet arrest quotas can induce police officers to make arrests in the absence of probable cause.

**128.** Upon information and belief, the arrest quotas promulgated by Defendant CITY OF NEW YORK induce New York City police officers, such as the Defendant Police Officers herein, to make arrests in the absence of probable cause, in violation of the constitutional rights of individuals to be free from unreasonable seizures.

**129.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy was confirmed as a finding of fact when, on February 18, 2011, the jury in *Bryant v. City of New York*, Kings County Supreme Court Docket #022011/2007, found that the

plaintiff in that case's arrest had resulted from a policy "regarding the number of arrests

officers were to make that violated plaintiff's constitutional rights and contributed to her

arrest" imposed by Defendant City of New York.

**130.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy

may further be inferred from the admission by Deputy Commissioner Paul J. Browne, as

reported by the media on November 8, 2010, that commanders are permitted to set

"productivity goals."[12]

**131.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy

may further be inferred from the posting of lists of quantitative targets for various forms

of summonses at the 77th Precinct in Brooklyn. *See* fn12.

**132.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy

may further be inferred from the tapes recordings acquired by WABC-TV/DT, including,

among other admissions, a 41st precinct sergeant explaining that each of his officers is

held to a twenty summons per month and one arrest per month enforcement quota, as

reported by the media on March 3, 2010.[13]

**133.** The existence of the aforesaid unconstitutional arrest quota custom and/or policy

may further be inferred from the tape recordings acquired by the Village Voice,

including, among other admissions, an 81st precinct sergeant telling his officers to make

---

[12] Fanelli, James, "Cops At Brooklyn's Crime-Ridden 77[th] Precinct Told To Meet Quotas For Moving Violations, Memos Say," New York Daily News, November 8, 2010. Article incorporated by reference herein and available online at
http://www.nydailynews.com/ny_local/2010/11/08/2010-11-08_cops_told_to_meet_quotas.html.
[13] Hoffer, Jim, "NYPD Officer Claims Pressure To Make Arrests," WABC News, March 3, 2010. Article incorporated by reference herein and available online at
http://abclocal.go.com/wabc/story?section=news/investigators&id=7305356.

"special" arrests as directed by their superiors even if they must void the arrests at the end of their shifts, as reported by the media on May 11, 2010.[14]

134. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred from the full page color advertisement placed by the Patrolmen's Benevolent Association of the City of New York in the May 7, 2012 edition of the New York Daily News, which states "Don't Blame the Cop[,] Blame NYPD Management For the pressure to write summonses and the pressure to convict motorists[.] Because of ticket quotas, New York City police officers are being pressured to write summonses to as many motorists as possible...."

135. The existence of the aforesaid unconstitutional arrest quota custom and/or policy may further be inferred to have continued to the present date from the opinion granting class certification in *Floyd v. The City of New York*, 08 Civ 1034 (SDNY May 16, 2012), in which the Honorable District Judge Shira A. Scheindlin noted the existence of a Police Officer Performance Objectives Operations Order dated October 17, 2011, in which "Commissioner Kelly directed all commands that 'Department managers **can** and **must** set performance goals,' relating to 'the issuance of summonses, the stopping and questioning of suspicious individuals, and the arrests of criminals.'" *Floyd* Document 206 at 18-19, *citing* 10/17/11 Police Officer Performance Objectives Operations Order. (emphasis in original).

136. Upon information and belief, and despite due and repeated notice that New York City Police Officers such as the Defendant Police Officers have charged and continue to

---

[14] Rayson, Graham, "The NYPD Tapes, Part 2: Bed-Stuy Street Cops Ordered: Turn This Place Into A Ghost Town." Village Voice, May 11, 2010. Article incorporated by reference herein and available online at http://www.villagevoice.com/2010-05-11/news/nypd-tapes-part-2-bed-stuy/.

charge individuals with crimes and violations, and to punitively and improperly send individuals for involuntary psychiatric evaluations, as pretexts to justify punitive false arrests undertaken in the absence of probable cause, to date Defendant City of New York has not implemented any particular oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "contempt of cop" and "cover charge" practices and customs.

137.    The foregoing customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department evince deliberate indifference to the safety, well-being, and constitutional rights of individuals such as Plaintiff ARLES CEPEDA.

138.    As a result of the above constitutionally impermissible conduct, Plaintiff ARLES CEPEDA was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of property, damage to property, legal expenses and damage to her reputation and standing within her community.

139.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

## FIFTH CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. §1983

140.    Plaintiff ARLES CEPEDA incorporates the allegations above by reference.

141.    The Defendant Police Officers, and Defendant CITY OF NEW YORK had an affirmative duty to intervene on Plaintiff ARLES CEPEDA's behalf to prevent the violation of her constitutional rights.

142.    The individual Defendant Police Officers failed to intervene on Plaintiff ARLES CEPEDA's behalf to prevent the violation of her constitutional rights despite having had a realistic opportunity to do so.

143.     The individual Defendant Police Officers failed to intervene on Plaintiff ARLES

CEPEDA 's behalf to prevent the violation of her constitutional rights despite having

substantially contributed to the circumstances within which the Plaintiff's rights were violated by

their affirmative conduct.

144.     As a result of the aforementioned conduct of the individual Defendants, Plaintiff

ARLES CEPEDA's constitutional rights were violated.

145.     As a result of the above constitutionally impermissible conduct, Plaintiff was caused

to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear,

humiliation, loss of freedom, loss of wages, legal expenses and damage to her reputation and

standing within her community.

146.     As a result of Defendants' impermissible conduct, Plaintiff demands judgment

against Defendants in a sum of money to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### MALICIOUS ABUSE OF PROCESS UNDER 42 U.S.C. § 1983

147.     Plaintiff ARLES CEPEDA incorporates the allegations above by reference.

148.     Defendants instigated legal process to place Plaintiff ARLES CEPEDA under arrest.

149.     Defendants arrested Plaintiff ARLES CEPEDA in order to obtain collateral objectives

outside the legitimate ends of the legal process.

150.     These collateral objectives outside the legitimate ends of the legal process include but

are not limited to: the Defendant Police Officers' personal satisfaction and/or subjective sense(s)

of vindication for Plaintiff ARLES CEPEDA's putative lack of respect for the Defendant Police

Officers' time, as demonstrated by her making valid and legitimate complaints via 311 regarding

the conditions in her building.

30

151.    These collateral objectives outside the legitimate ends of the legal process include but are not limited to: the Defendant Police Officers' desire to penalize Plaintiff ARLES CEPEDA for attempting to inform the Defendants of conditions requiring attention from agents of Defendant CITY OF NEW YORK.

152.    These collateral objectives outside the legitimate ends of the legal process include but are not limited to: the Defendant Police Officers' seeking to meet quantitative "productivity goals" for enforcement activity imposed by Defendant CITY OF NEW YORK through NYPD supervisors upon the Defendant Police Officers.

153.    *Inter alia*, Defendants acted with intent to do harm to Plaintiff ARLES CEPEDA without excuse or justification.

154.    As a result of the aforementioned conduct of the individual Defendants, Plaintiff ARLES CEPEDA's constitutional rights were violated.

155.    As a result of the above constitutionally impermissible conduct, Plaintiff ARLES CEPEDA was caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to her reputation and standing within her community.

156.    As a result of Defendants' impermissible conduct, Plaintiff demands judgment against Defendants in a sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the interest of justice.

DATED:   New York, New York
         January 23, 2015

Respectfully submitted,

SAMUEL B. COHEN [SC 0622]
STECKLOW COHEN & THOMPSON
217 CENTRE STREET FLOOR 6
New York, New York 10013
[212] 566-8000
[212] 202-4952/FAX
SAM@SCTLAW.NYC
ATTORNEYS FOR PLAINTIFF